# Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization

The President's inherent, constitutional authority as Commander-in-Chief, his broad foreign policy powers, and his duty to take care that the laws be faithfully executed generally empower him to deploy the armed forces abroad without a declaration of war by Congress or other congressional authorization. A historical pattern of presidential initiative and congressional acquiescence in emergency situations calling for immediate action, including situations involving rescue and retaliation, confirm this inherent power, and the courts have generally declined to review its use.

The War Powers Resolution generally precludes presidential reliance on statutory authority for military actions clearly involving hostilities, unless a statute expressly authorizes such actions, and regulates the President's use of his constitutional powers in this regard. In particular, it introduces consultation and reporting requirements in connection with any use of the armed forces, and requires the termination of such use within 60 days or whenever Congress so directs.

The term "United States Armed Forces" in the War Powers Resolution does not include military personnel detailed to and under the control of the Central Intelligence Agency. [In an opinion issued on October 26, 1983, published as an appendix to this opinion, this conclusion is reconsidered and reversed.]

The term "hostilities" in the War Powers Resolution does not include sporadic military or paramilitary attacks on our armed forces stationed abroad; furthermore, its applicability requires an active decision to place forces in a hostile situation rather than their simply acting in self-defense.

The requirement of consultation in the War Powers Resolution is not on its face unconstitutional, though it may, if strictly construed, raise constitutional questions.

The provision in the War Powers Resolution permitting Congress to require removal of our armed forces in particular cases by passage of a concurrent resolution not presented to the President is a *prima facie* violation of Article I, § 7 of the Constitution.

February 12, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your request for our review of certain questions regarding the effect of the War Powers Resolution on the President's power to use military force without special congressional authorization and related issues. We have considered the President's existing power to employ the armed forces in any of three distinct kinds of operations: (1) deployment abroad at some risk of engagement—for example, the current presence of the fleet in the Persian Gulf region; (2) a military expedition to rescue the hostages or to retaliate against Iran if the hostages are harmed; (3) an attempt to repel an assault that

185

threatens our vital interests in that region. We believe that the President has constitutional authority to order all of the foregoing operations.

We also conclude that the War Powers Resolution, 50 U.S.C. §§ 1541–1548, has neither the purpose nor the effect of modifying the President's power in this regard. The Resolution does, however, impose procedural requirements of consultation and reporting on certain presidential actions, which we summarize. The Resolution also provides for the termination of the use of the armed forces in hostilities within 60 days or sooner if directed by a concurrent resolution of Congress. We believe that Congress may terminate presidentially initiated hostilities through the enactment of legislation, but that it cannot do so by means of a legislative veto device such as a concurrent resolution.

## I. The President's Constitutional Authority to Employ the Armed Forces

The centrally relevant constitutional provisions are Article II, § 2, which declares that "the President shall be Commander in Chief of the Army and Navy of the United States," and Article I, § 8, which grants Congress the power "To declare War." Early in our constitutional history, it perhaps could have been successfully argued that the Framers intended to confine the President to directing the military forces in wars declared by Congress.[1] Even then, however, it was clear that the Framers contemplated that the President might use force to repel sudden invasions or rebellions without first seeking congressional approval.[2]

In addition to the Commander-in-Chief Clause, the President's broad foreign policy powers support deployment of the armed forces abroad.[3] The President also derives authority from his duty to "take Care that the Laws be faithfully executed," [4] for both treaties and customary international law are part of our law and Presidents have repeatedly asserted authority to enforce our international obligations [5] even when Congress has not enacted implementing legislation.

---

[1] Hamilton, in The Federalist No. 69, disparaged the President's power as that of "first General and Admiral" of the Nation, contrasting it to that of the British king, who could declare war and raise and regulate armies.

[2] See M. Farrand, 2 The Records of the Federal Convention of 1787, 318–19 (1911). Other presidential actions, such as protecting American lives and property abroad and defending our allies, were not directly considered by the Framers. This is understandable: the military needs of the 18th century probably did not require constitutional authority for immediate presidential action in case of an attack on an ally.

[3] See generally United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936).

[4] See In re Neagle, 135 U.S. 1 (1890) (broad view of inherent presidential power to enforce constitutional as well as statutory provisions).

[5] It should be observed, however, that treaties may not modify the basic allocation of powers in our constitutional scheme. Reid v. Covert, 354 U.S. 1 (1957). Mutual defense treaties are generally not self-executing regarding the internal processes of the signatory powers. Similarly, customary international law, which includes authority for reasonable reprisals in response to another country's breach of international obligation, probably does not confer authority on the President beyond the warrant of necessity.

186

We believe that the substantive constitutional limits on the exercise of these inherent powers by the President are, at any particular time, a function of historical practice and the political relationship between the President and Congress. Our history is replete with instances of presidential uses of military force abroad in the absence of prior congressional approval. This pattern of presidential initiative and congressional acquiescence may be said to reflect the implicit advantage held by the executive over the legislature under our constitutional scheme in situations calling for immediate action. Thus, constitutional practice over two centuries, supported by the nature of the functions exercised and by the few legal benchmarks that exist, evidences the existence of broad constitutional power. [6]

The power to deploy troops abroad without the initiation of hostilities is the most clearly established exercise of the President's general power as a matter of historical practice. Examples of such actions in the past include the use of the Navy to "open up" Japan, and President Johnson's introduction of the armed forces into the Dominican Republic in 1965 to forestall revolution.

Operations of rescue and retaliation have also been ordered by the President without congressional authorization even when they involved hostilities. Presidents have repeatedly employed troops abroad in defense of American lives and property. A famous early example is President Jefferson's use of the Navy to suppress the Barbary pirates. Other instances abound, including protection of American citizens in China during the Boxer Rebellion in 1900, and the use of troops in 1916 to pursue Pancho Villa across the Mexican border. Recent examples include the Danang sealift during the collapse of Vietnam's defenses (1975); the evacuation of Phnom Penh (Cambodia, 1975); the evacuation of Saigon (1975); the *Mayaguez* incident (1975); evacuation of civilians during the civil war in Lebanon (1976); and the dispatch of forces to aid American victims in Guyana (1978).

This history reveals that purposes of protecting American lives and property and *retaliating* against those causing injury to them are often intertwined. In *Durand* v. *Hollins,* 8 F. Cas. 111 (No. 4186) (C.C.S.D.N.Y. 1860), the court upheld the legality of the bombardment of a Nicaraguan town which was ordered because the local authorities refused to pay reparations for an attack by a mob on the United States Consul. Policies of deterrence seem to have eroded any clear distinction between cases of rescue and retaliation.

Thus, there is much historical support for the power of the President to deploy troops without initiating hostilities and to direct rescue and retaliation operations even where hostilities are a certainty. There is

---

[6] In other contexts, the Supreme Court has recognized the validity of longstanding presidential practices never expressly authorized by Congress but arguably ratified by its silence. *See United States v. Midwest Oil Co.,* 236 U.S. 459 (1915) (withdrawal of public lands from private acquisition).

precedent as well for the commitment of United States armed forces, without prior congressional approval or declaration of war, to aid an ally in repelling an armed invasion, in President Truman's response to the North Korean invasion of South Korea.[7] But clearly such a response cannot be sustained over time without the acquiescence, indeed the approval, of Congress, for it is Congress that must appropriate the money to fight a war or a police action. While Presidents have exercised their authority to introduce troops into Korea and Vietnam [8] without prior congressional authorization, those troops remained only with the approval of Congress.

## II. Judicial Review of the President's Exercise of Constitutional Power

In the only major case dealing with the role of the courts with regard to this general subject, the Supreme Court upheld presidential power to act in an emergency without prior congressional authority. In the *Prize Cases,* 67 U.S. 635 (1863), the Court upheld President Lincoln's blockade of Southern ports following the attack on Fort Sumter. The Court thought that particular uses of inherent executive power to repel invasion or rebellion were "political questions" not subject to judicial review: "This Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted." (*Id.* at 670). The Court's unwillingness to review the need for presidential action in a particular instance in the *Prize Cases* or since has left the field to the President and Congress; much has depended on presidential restraint in responding to provocation, and on congressional willingness to support his initiatives by raising and funding armies.

More recently, the courts have applied the rationale of the *Prize Cases* to avoid judicial review of the constitutionality of the President's actions with regard to the Vietnam conflict.[9] Although the Supreme Court did not hear argument in the case, we believe some significance may be attached to the Court's summary affirmance of a three-judge court's decision that the constitutionality of the government's involvement in that conflict was a political question and thus unsuitable for judicial resolution. *Atlee* v. *Laird,* 347 F. Supp. 689 (E.D.Pa. 1972), *aff'd,* 411 U.S. 911 (1973).

---

[7] Although support for this introduction of our armed forces into a "hot" war could be found in the U.N. Charter and a Security Council resolution, the fact remains that this commitment of substantial forces occurred without congressional approval.

[8] The substantial American military presence in Vietnam before the Tonkin Gulf Resolution was known to and supported by Congress.

[9] *See, e.g., Mora* v. *McNamara,* 387 F.2d 862 (D.C. Cir.), *cert. denied* 389 U.S. 934 (1967); *McArthur* v. *Clifford,* 393 U.S. 1002 (1968); *Massachusetts* v. *Laird,* 400 U.S. 886 (1970).

### III. The President's Statutory Powers

Congress has restricted the President's ability to rely on statutory authority for the use of armed force abroad by its provision in the War Powers Resolution that authority to introduce the armed forces into hostilities or into situations "wherein involvement in hostilities is clearly indicated by the circumstances" is not to be inferred from any statutory provision not specifically authorizing the use of troops and referring to the War Powers Resolution. 50 U.S.C. § 1547. Thus, the President may not rely on statutory authority for military actions clearly involving hostilities unless the statute expressly authorizes such actions.

Nevertheless, it may be possible for the President to draw authority for some actions not involving the use of the armed forces in actual or imminent hostilities from the provisions of an 1868 statute, now 22 U.S.C. § 1732:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

We are unaware of any instances in which this provision has been invoked. It was passed in response to a dispute with Great Britain after the Civil War, in which that nation was trying its former subjects, who had become naturalized Americans, for treason. The House version of the bill, which would have authorized the President to suspend all commerce with the offending nation and to round up its citizens found in this country as hostages, was replaced by the present language which was in the Senate bill. Cong. Globe, 40th Cong., 2d Sess. 4205, 4445–46 (1868). It is not clear whether this change was meant to restrict the President to measures less drastic than those specified in the House bill. It is also not clear what Congress meant by the phrase "not amounting to acts of war." At least Congress did not seem to be attempting to limit the President's constitutional powers.

189

## IV. The War Powers Resolution

The War Powers Resolution, 50 U.S.C. §§ 1541–48, begins with a statement of purpose and policy that seems designed to limit presidential use of armed forces in hostilities to situations involving a declaration of war, specific statutory authorization, or an attack on the United States, its possessions, or its armed forces. This policy statement, however, is not to be viewed as limiting presidential action in any substantive manner. That much is clear from the conference report, which states that subsequent portions of the Resolution are not dependent on the policy statement,[10] and from its construction by the President since its enactment.

The important provisions of the Resolution concern consultation and reporting requirements and termination of the involvement of the armed forces in hostilities. The Resolution requires that the President consult with Congress "in every possible instance" before introducing the armed forces into hostilities, and regularly thereafter. 50 U.S.C. § 1542.

The reporting requirements apply not only when hostilities are taking place or are imminent, but also when armed forces are sent to a foreign country equipped for combat. 50 U.S.C. § 1543(a)(2), (3). The report must be filed within 48 hours from the time that they are introduced into the area triggering the requirement, and not from the time that the decision to dispatch them is made.[11] The report must include:

> (A) The circumstances necessitating the introduction of United States Armed Forces;
>
> (B) the constitutional and legislative authority under which such introduction took place; and
>
> (C) the estimated scope and duration of the hostilities or involvement.

50 U.S.C. § 1543(a)(3). Reports which have been filed in the past have been brief and to the point. The reference to legal authority has been one sentence, referring to the President's constitutional power as Commander-in-Chief and Chief Executive.[12]

---

[10] *See* H.R. Rep. No. 547, 93d Cong., 1st Sess. 8 (1973). Section 1547(d)(1) states that the Resolution is not intended to alter the constitutional authority of the President. Fisher, *A Political Context for Legislative Vetos,* 93 Political Science Quarterly 241, 246 (1978), explains that because the two Houses could not agree on the President's responsibilities under Article II, Congress fell back on purely procedural controls.

[11] *See generally* Franck, *After the Fall: The New Procedural Framework for Congressional Control over the War Power,* 71 Am. J. Int'l L. 605, 615 (1977).

[12] *See War Powers: A Test of Compliance Relative to the Danang Sealift, the Evacuation of Phnom Penh, the Evacuation of Saigon, and the Mayaguez Incident, Hearings before the Subcommittee on Int'l Security and Scientific Affairs of the House Comm. on Int'l Relations,* 94th Cong., 1st Sess. 75 (Mayaguez) (1975) (hereafter *War Powers: A Test of Compliance); The War Powers Resolution, Relevant Documents, Correspondence, Reports,* Subcomm. on Int'l Security and Scientific Affairs, House Comm. on Int'l Relations, 94th Cong., 1st Sess. 40 (Danang); 42 (Phnom Penh); 45 (*Mayaguez*) (Comm. Print 1976).

The Resolution requires the President to terminate any use of the armed forces in hostilities after 60 days unless Congress has authorized his action.[13] It also requires termination whenever Congress so directs by concurrent resolution.[14]

As enacted, the ambiguous language of the Resolution raises several issues of practical importance regarding the scope of its coverage as well as questions of constitutional magnitude. We shall discuss first several issues related to the scope of its coverage and then discuss several constitutional issues it raises.

A threshold question is whether the Resolution's use of the term "United States Armed Forces" was intended to reach deployment or use by the President of personnel other than members of the Army, Air Force, Marine Corps, Navy, or Coast Guard functioning under the control of the Secretary of Defense and the Joint Chiefs of Staff. For example, does it extend to military personnel detailed to and under the control of the Central Intelligence Agency (CIA), CIA agents themselves, or other individuals contracting to perform services for the CIA or the Department of Defense? We believe that none of these personnel are covered by the Resolution.*

The provision most closely on point is § 1547(c), which defines the term "introduction of United States Armed Forces" to include "the assignment of members of such armed forces to command, coordinate, participate in the movement of, or accompany the regular or irregular military forces of any foreign country" in actual or imminent hostilities. This provision appears to be intended to identify activities subject to the Resolution, and not the identity of persons constituting "members of such armed forces." It could be argued that anyone officially a member of the armed forces of this country, although on temporary detail to a civilian agency, is within this provision and therefore covered by the Resolution. The legislative history of the Resolution, however, persuades us to take a contrary view. In the Senate, where § 1547(c) originated, Senator Eagleton introduced the following amendment:

> Any person employed by, under contract to, or under the direction of any department or agency of the United States Government who is either (a) actively engaged in hostilities in any foreign country; or (b) advising any regular or irregular military forces engaged in hostilities in any foreign country shall be deemed to be a member of

[13] 50 U.S.C. § 1544(b). There are exceptions to the 60-day period if Congress extends the period or is unable to meet, or if the President certifies that more time is needed to extract the forces.
[14] 50 U.S.C. § 1544(c).
*NOTE: This conclusion respecting the applicability of the War Powers Resolution to military personnel detailed to the Central Intelligence Agency was reconsidered and reversed in an opinion dated October 26, 1983, which appears as an appendix to this opinion at p. 197 *infra*. Ed.

the Armed Forces of the United States for the purposes
of this Act.

He explained that it was intended to cover CIA paramilitary oper-
ations involving persons who might be military officers under contract
to the CIA. 119 Cong. Rec. 25,079–83 (1973). He recognized that
without this amendment the Resolution as drafted would not cover the
activities of such personnel, and argued that it should, citing CIA
activities in Laos as leading to America's Indo-China involvement.
Senators Muskie and Javits opposed the amendment, principally for
reasons of committee jurisdiction. They argued that if the Resolution
were extended to cover the CIA, its chances to escape presidential veto
might be jeopardized, and that the matter should be considered pursu-
ant to proposed legislation to govern the CIA. Senator Javits also
argued that the amendment was overbroad, since it would include
foreign nationals contracting with the CIA. He argued that CIA activi-
ties should not be within the Resolution, because the CIA lacks the
appreciable armed force that can commit the Nation to war.
Senator Fulbright came to Senator Eagleton's defense, arguing that the
amendment, applying to the CIA and DOD civilians alike, would avoid
circumvention of the Resolution. *Id.* at 25,083–84. No one suggested
that the Resolution would apply to anyone other than military person-
nel under Department of Defense control unless the amendment passed.
The amendment was defeated.[15]

In the House of Representatives, Congressman Badillo asked Con-
gressman Zablocki, the manager of the bill, whether he would support
in the conference committee a Senate provision that would include the
CIA within the bill when it carried out military functions. Congressman
Zablocki replied that he would support the Eagleton amendment if it
passed the Senate. 119 Cong. Rec. 24,697 (1973).

Another provision of the Resolution that had its source in the House
is consistent with the view that the Resolution was not intended to
apply to CIA paramilitary activities. The reporting requirements of
§ 1543(a)(2) apply when the armed forces are introduced "into the
territory, air space or waters of a foreign nation, while equipped for
combat . . . ." It is clear from H.R. Rep. No. 287, 93d Cong., 1st Sess.
8 (1973), that this provision was using the term "armed forces" to mean
significant bodies of military personnel:

> A report would be required any time combat military
> forces were sent to another nation to alter or preserve the
> existing political status quo or to make the U.S. presence
> felt. Thus, for example, the dispatch of Marines to Thai-

---

[15] It is an accepted canon of statutory construction that the rejection of an amendment indicates that
the bill is not meant to include the provisions in the failed amendment. *See, e.g., Norwegian Nitrogen
Products Co.* v. *United States,* 288 U.S. 294, 306 (1933).

land in 1962 and the quarantine of Cuba in the same year would have required Presidential reports.

A companion provision reinforces the view that the Resolution applies only to significant bodies of military personnel. The House report goes on to discuss § 1543(a)(3), which requires a report when the number of armed forces equipped for combat is substantially enlarged in a foreign nation. For examples of substantial increases in combat troops, the report gives the dispatch of 25% more troops to an existing station, or President Kennedy's increase in U.S. military advisers in Vietnam from 700 to 16,000 in 1962.

The second threshold question raised by the War Powers Resolution regards the meaning of the word "hostilities" as used in § 1543(a)(1). In the 1975 hearings on executive compliance with the Resolution, Chairman Zablocki of the Subcommittee on International Security and Scientific Affairs drew the Legal Adviser's attention to a discussion of "hostilities" in the House report on the Resolution:

> The word *hostilities* was substituted for the phrase *armed conflict* during the subcommittee drafting process because it was considered to be somewhat broader in scope. In addition to a situation in which fighting actually has begun, *hostilities* also encompasses a state of confrontation in which no shots have been fired but where there is a clear and present danger of armed conflict. "*Imminent hostilities*" denotes a situation in which there is a clear potential either for such a state of confrontation or for actual armed conflict.

H.R. Rep. No. 287, 93d Cong., 1st Sess. 7 (1973) (emphasis added). Chairman Zablocki then requested the views of the Departments of State and Defense regarding the Executive's interpretation of the term "hostilities" in view of the language quoted above. Those Departments responded in a letter to the Chairman dated June 5, 1975, *reprinted* in *War Powers: A Test of Compliance* at 38–40. After first noting that "hostilities" is "definable in a meaningful way only in the context of an actual set of facts," the letter went on to state that, as applied by the Executive, the term included:

> a situation in which units of the U.S. armed forces are actively engaged in exchanges of fire with opposing units of hostile forces, and "imminent hostilities" was considered to mean a situation in which there is a serious risk from hostile fire to the safety of United States forces. In our view, neither term necessarily encompasses irregular or infrequent violence which may occur in a particular area.

*Id.* at 39.

We agree that the term "hostilities" should not be read necessarily to include sporadic military or paramilitary attacks on our armed forces stationed abroad. Such situations do not generally involve the full military engagements with which the Resolution is primarily concerned. For the same reason, we also believe that as a general matter the presence of our armed forces in a foreign country whose government comes under attack by "guerrilla" operations would not trigger the reporting provisions of the War Powers Resolution unless our armed forces were assigned to "command, coordinate, participate in the movement of, or accompany" the forces of the host government in operations against such guerrilla operations.[16] 50 U.S.C. § 1547(c).

Furthermore, if our armed forces otherwise lawfully stationed in a foreign country were fired upon and defended themselves, we doubt that such engagement in hostilities would be covered by the consultation and reporting provisions of the War Powers Resolution. The structure and thrust of those provisions is the "introduction" of our armed forces into such a situation and not the fact that those forces may be engaged in hostilities. It seems fair to read "introduction" to require an active decision to place forces in a hostile situation rather than their simply acting in self-defense.[17]

A final issue of statutory construction involves interpretation of the requirement for consultation with "Congress."[18] As a practical matter, consultation with more than a select group of congressional leaders has never been attempted. The Legal Adviser of the State Department has argued for this Administration, correctly in our view, that there are practical limits to the consultation requirement; he has said that meaningful consultations with "an appropriate group of congressional representatives should be possible."[19] During the *Mayaguez* incident about ten House and eleven Senate Members were contacted concerning the measures to be taken by the President.[20]

In requiring consultation in "every possible instance," Congress meant to be firm yet flexible. H. R. Rep. No. 287, 93d Cong., 1st Sess. 6 (1973). The House report continued:

> The use of the word "every" reflects the committee's belief that such consultation *prior* to the commitment of armed forces should be inclusive. In other words, it

[16] We believe that the definition of "introduction of United States Armed Forces" in § 1547(c) supports the proposition that members of the armed forces stationed in a foreign country for purposes of training or advising military forces of the host government are not generally to be viewed as subject to the War Powers Resolution.

[17] In contrast, as passed by the Senate, the bill would have required a report whenever our armed forces are "engaged in hostilities." S. 440, 93d Cong., 1st Sess. § 4, 119 Cong. Rec. 25,119 (1973).

[18] This replaced an earlier version which merely required consultation with the leadership and appropriate committees of Congress. H. R. Conf. Rep. No. 547, 93d Cong., 1st Sess. 8 (1973); H. R. Rep. No. 287, 93d Cong., 1st Sess. 6 (1973).

[19] Statement of State Department Legal Adviser Hansell before the Senate Foreign Relations Committee, reprinted in State Department Bulletin, August 29, 1977, at 291–92.

[20] Testimony of State Department Legal Adviser Leigh in *War Powers: A Test of Compliance* at 78.

should apply to extraordinary and emergency circumstances—even when it is not possible to get formal congressional approval in the form of a declaration of war or other specific authorization.

At the same time, through use of the word "possible" it recognizes that a situation may be so dire, e.g., hostile missile attack underway, and require such instantaneous action that no prior consultation will be possible.

The State Department Legal Adviser, again speaking for this Administration, has pointed out the problem that exists in emergencies, noting that "[B]y their very nature some emergencies may preclude opportunity for legislative debate prior to involvement of the Armed Forces in hostile or potentially hostile situations." He recognized, however, that consultation may be had "in the great majority of cases." [21]

There may be constitutional considerations involved in the consultation requirement. When President Nixon vetoed the Resolution, he did not suggest that either the reporting or consultation requirements were unconstitutional. Department of State Bulletin, November 26, 1973, at 662–64. No Administration has taken the position that these requirements are unconstitutional on their face. Nevertheless, there may be applications which raise constitutional questions. This view was stated succinctly by State Department Legal Adviser Leigh:

> Section 3 of the War Powers Resolution has, in my view, been drafted so as not to hamper the President's exercise of his constitutional authority. Thus, Section 3 leaves it to the President to determine precisely how consultation is to be carried out. In so doing the President may, I am sure, take into account the effect various possible modes of consultation may have upon the risk of a breach in security. Whether he could on security grounds alone dispense entirely with "consultation" when exercising an independent constitutional power, presents a question of constitutional and legislative interpretation to which there is no easy answer. In my personal view, the resolution contemplates at least some consultation in every case irrespective of security considerations unless the President determines that such consultation is inconsistent with his constitutional obligation. In the latter event the President's decision could not as a practical matter be challenged but he would have to be prepared to accept the political consequences of such action, which might be heavy.

---

[21] Statement of Legal Adviser Hansell, *id.*

*War Powers: A Test of Compliance* at 100. Other constitutional issues raised by the Resolution concern the provisions terminating the use of our armed forces either through the passage of time (60 days) or the passage of a concurrent resolution.

We believe that Congress may, as a general constitutional matter, place a 60-day limit on the use of our armed forces as required by the provisions of § 1544(b) of the Resolution. The Resolution gives the President the flexibility to extend that deadline for up to 30 days in cases of "unavoidable military necessity." This flexibility is, we believe, sufficient under any scenarios we can hypothesize to preserve his constitutional function as Commander-in-Chief. The practical effect of the 60-day limit is to shift the burden to the President to convince the Congress of the continuing need for the use of our armed forces abroad. We cannot say that placing that burden on the President unconstitutionally intrudes upon his executive powers.

Finally, Congress may regulate the President's exercise of his inherent powers by imposing limits *by statute.* We do not believe that Congress may, on a case-by-case basis, require the removal of our armed forces by passage of a concurrent resolution which is not submitted to the President for his approval or disapproval pursuant to Article I, § 7 of the Constitution.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

APPENDIX

## War Powers Resolution: Detailing of
## Military Personnel to the CIA

October 26, 1983

### MEMORANDUM OPINION FOR
### THE DEPUTY ATTORNEY GENERAL

This responds to your inquiry whether a Central Intelligence Agency (CIA) operation utilizing military equipment and military personnel detailed to the CIA would require compliance with the War Powers Resolution. In responding to this inquiry, this Office has found it necessary to re-examine and revise a broad conclusion expressed by this Office in its February 12, 1980 memorandum, the "Harmon Memorandum,"[1] that "military personnel detailed to and under the control of the CIA . . ." would not be covered by the War Powers Resolution were they to be deployed into hostilities or a situation otherwise triggering that Resolution.

The heart of the argument in the Harmon Memorandum is the essentially negative inference drawn from the Senate's rejection of the so-called "Eagleton amendment,"[2] which is reprinted on page 8 of that memorandum. The Eagleton amendment would have supplemented § 8(c) of the War Powers Resolution regarding the definition of the term "introduction of United States Armed Forces." As enacted, § 8(c) now provides:

> For purposes of this chapter, the term "introduction of United States Armed Forces" includes the assignment of members of such armed forces to command, coordinate,

---

[1] Memorandum for the Attorney General entitled "Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization" from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Feb. 12, 1980. The occasion for this memorandum was planning relative to the holding by Iran of American hostages and a range of potential American responses to that situation including a possible rescue attempt. The memorandum was general, however, and did not focus on a specific factual situation. Particularly, the Harmon Memorandum's comments concerning a CIA operation involving detailed military personnel was a part of a general discussion and was not in response to a precise fact-specific question.

[2] Senator Eagleton introduced several amendments to the War Powers Resolution. Some were adopted. This particular amendment was enumerated as amendment No. 366, and is set out in 119 Cong. Rec. 25,079 (1973).

> participate in the movement of, or accompany the regular
> or irregular military forces of any foreign country or
> government when such military forces are engaged, or
> there exists an imminent threat that such forces will
> become engaged, in hostilities.

50 U.S.C. § 1547(c). Senator Eagleton urged adding the following sentence:

> Any person employed by, under contract to, or under the
> direction of any department or agency of the United
> States Government who is either (a) actively engaged in
> hostilities in any foreign country; or (b) advising any
> regular or irregular military forces engaged in hostilities
> in any foreign country shall be deemed to be a member of
> the Armed Forces of the United States for the purposes
> of this Act.

119 Cong. Rec. 25,079 (1973).

We observe at the outset that the Eagleton amendment on its face does not suggest that it deals with a situation in which uniformed personnel would be detailed to the CIA; indeed, what it would have done on its face was to provide that all government employees under the direction of *any* department or agency either engaged in hostilities in any foreign country or advising any regular or irregular military forces engaged in hostilities would be deemed to be a member of the armed forces for purposes of the War Powers Resolution. In other words, military or paramilitary activities by the CIA would have triggered the War Powers Resolution irrespective of whether the activities were performed by military personnel, civilian employees, or persons under contract to or under the control of the CIA.

The sentences in the Harmon memorandum that follow the quotation of the Eagleton amendment read as follows:

> He [Senator Eagleton] explained that it [his amendment]
> was intended to cover CIA paramilitary operations in-
> volving persons who might be military officers under
> contract to the CIA. 119 Cong. Rec. 25079–83 (1973). He
> recognized that without this amendment the Resolution as
> drafted would not cover the activities of such personnel,
> and argued that it should, citing CIA activities in Laos as
> leading to America's Indo-China involvement.

We have carefully reviewed not only the remarks of Senator Eagleton contained in the cited pages of the Congressional Record, but also the full Senate debate on the Eagleton amendment. We have been unable to find a single remark made by Senator Eagleton or any other Senator that reasonably could be read to support the assertion con-

198

tained in the sentences quoted above from the Harmon Memorandum. In fact, Senator Eagleton and the other Senators who spoke at length for or against the Eagleton amendment manifested an understanding that the debate revolved around the CIA's potential use of *civilian* personnel to conduct combat operations rather than situations in which the conduct of the same operations by military forces might occur. Senator Eagleton and his principal ally in the floor debate, Senator Fulbright, repeatedly expressed the view that failing to include activities which the CIA might conduct with civilian personnel was a major "loophole" which would allow Presidents to evade the War Powers Resolution. The whole point of the Eagleton amendment, which emerges with considerable clarity once the legislative history is examined closely, is that Senator Eagleton intended that *civilian* forces were to be treated the same as military forces for purposes of application of the War Powers Resolution:

> My amendment would circumscribe the President's use of American *civilian* combatants in the same manner uniformed Armed Forces are circumscribed by S. 440 as presently drafted. It would, in other words, prevent a President from engaging *American civilians*, either directly or as advisers, in a hostile situation without the express consent of Congress.

119 Cong. Rec. 25,079 (1973) (emphasis added). Thus, Senator Eagleton spoke at considerable length about his concern that wars or lengthy and costly military engagements could be caused by CIA covert civilian operations. The discussion did not relate to covering, by this amendment, the detailing of military personnel to the CIA.

Furthermore, the record implies, albeit less strongly on this point, that CIA activities which actually used military personnel would be covered by the War Powers Resolution irrespective of the Eagleton amendment.

The closest that Senator Eagleton himself comes to saying something similar to what was attributed to him by the Harmon Memorandum is in a paragraph that reads as follows:

> So military activities will be carried on by *civilian* employees of the Pentagon, because under the War Powers bill nothing prevents the Pentagon from hiring or contracting with civilian employees, *ex-military* people perhaps, but people that are called civilians.

*Id.* at 25,083 (emphasis added).

Senator Eagleton's statements do not support the argument that the Eagleton amendment was an attempt to expand the War Powers Resolution to embrace CIA activities using military personnel. When exam-

ined in their full context, it was concern over *any* American involvement in a military context which the Eagleton amendment was intended to address. He also said:

> unless we treat all Americans in military situations alike, whether they are wearing a green uniform, red-white-and-blue or a seersucker suit with arms—what payroll you are on is really secondary; whether you get it from the Pentagon or whether you become a member of the Armed Forces, the end result is the same: Americans are exposed to the risk of war. And as they are exposed to the risk of war, the country, then makes a commitment to war.

*Id.* at 25,080 (1973).

In this same debate, Senator Javits, speaking in opposition to the Eagleton amendment, stated his understanding of the applicability of the War Powers Resolution to paramilitary activities conducted by the CIA as follows:

> Another important consideration is that there [is] outside the Armed Forces . . . no agency of the United States which has any appreciable armed forces power, not even the CIA. They [the CIA] might have some clandestine agents with rifles and pistols engaging in dirty tricks, but there is no capability of appreciable military action that would amount to war. Even in the Laotian war, the regular U.S. Armed Forces had to be called in to give air support. *The minute combat air support is required you have the Armed Forces, and the* [*War Powers Resolution*] *becomes operative.*

*Id.* at 25,082 (emphasis added).

This debate over the Eagleton amendment stands rather clearly for the proposition that CIA civilian operations (at least most of them) were not embraced by the War Powers Resolution as ultimately passed by the Congress unadorned with the Eagleton amendment. We do not believe the negative inference to be drawn from the defeat of the Eagleton amendment can be stretched further than to confirm that CIA civilian operations are not embraced by the War Powers Resolution.

In summary, we believe the legislative history relied on in the Harmon Memorandum supports the proposition that Congress assumed that the CIA's use of civilian or ex-military personnel would not trigger the War Powers Resolution. We do not believe that that legislative history may be relied upon for the conclusion that the involvement of

military personnel, if temporarily detailed to the CIA and under civilian control, would remain outside the War Powers Resolution.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*